UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Kenneth Barber,

    Plaintiff,

v.                                                           Civil Action No. 5:10-cv-255

Andrew Pallito, Commissioner,
Vermont Department of Corrections,

    Defendant.

## REPORT AND RECOMMENDATION
(Doc. 20)

    Plaintiff Kenneth Barber, a Vermont inmate, brings this action claiming that he has received inadequate medical care while incarcerated. Defendant Andrew Pallito, Commissioner of the Vermont Department of Corrections ("DOC"), now moves for summary judgment arguing that Mr. Barber has failed to support his claims of Eighth Amendment violations and medical negligence. Although Mr. Barber initiated the case *pro se*, he is currently represented by Lamar Enzor, Esq. Commissioner Pallito is represented by Andy MacIlwaine, Esq. and Samuel Hoar, Esq. The pending summary judgment motion is unopposed.

    For the reasons set forth below, I recommend that the Court GRANT the motion for summary judgment, and that this case be DISMISSED.

## Factual Background

    Mr. Barber has been in DOC custody since June 11, 2003. For a period of time prior to December 1, 2009, he was incarcerated at a privately-owned prison facility in

Kentucky. Since December 2009, he has been held at the Southern State Correctional Facility ("SSCF") in Springfield, Vermont.

The Verified Complaint alleges that at some point during his incarceration, Mr. Barber was diagnosed with a rare disease known as transverse myelitis ("TM"). TM reportedly involves the abrupt onset of spinal cord inflammation, causing paralysis in the lower back, legs and feet. Mr. Barber claims that as a result of TM, he has suffered severe back, leg and joint pain. He also claims that for "close to a year" prior to his diagnosis, his complaints "about pain and tingling sensations in his arms and legs" were ignored, presumably by prison officials and/or medical personnel. (Doc. 5 at 4.) Mr. Barber contends that he submitted several sick call requests and formal grievances regarding his symptoms, but there are no such documents in the summary judgment record. *Id.* In fact, it appears that Mr. Barber has failed to respond to Commissioner Pallito's repeated discovery requests. (Doc. 20-1 at 5.)

The medical notes submitted by Pallito indicate that Mr. Barber began to develop symptoms of TM in the fall of 2009. (Doc. 20-3 at 1.) The Verified Complaint states that he was first admitted to the University of Kentucky Medical Center in Lexington, Kentucky, and was shortly thereafter transferred to Vermont. At the time of his hospital admission in Kentucky, he was allegedly unable to move his legs; had "sensory loss below his sternal notch;" experienced "pins and needles" in his legs and hands; suffered "fevers and rigors;" had difficulty urinating; experienced pain when moving his neck; and had difficulty swallowing food. (Doc. 5. at 5.) Mr. Barber reports that health care

providers conducted extensive medical testing ("everything from TB, to West Nile, and AIDS to Raibies [sic]") in an effort to provide a diagnosis. (*Id.*)

Upon his return to Vermont, Mr. Barber was seen by Dr. Elijah Stommel, a neurologist at Dartmouth Hitchcock Medical Center. (Doc. 20-3 at 1.) Dr. Stommel requested "[s]pine and brain MRIs with and without contrast" in order to "establish an objective measure of the present state of any observable lesions and with an interest in ruling out an unusual presentation of multiple sclerosis." (*Id.*) Initial efforts to perform the study were halted because Mr. Barber experienced severe claustrophobia, and arrangements were made to perform the testing at Fletcher Allen Hospital with anesthesia. (*Id.*) Dr. Stommel also "speculated on a possible role of Mr. Barber's hepatitis C positive status in the etiology of this problem." (*Id.*)

A subsequent status note from Mr. Barber's treating physician, Dr. Leppman, states that the MRI performed at Fletcher Allen showed the "expected findings of transverse myelitis." (Doc. 20-4 at 1.) The study did not show other neurological disease such as multiple sclerosis, nor did it reveal any masses or structural lesions of concern. (Doc. 20-4.) Dr. Leppman also reported that the neurologist at Dartmouth Hitchcock would be provided the results so that "hopefully he and neuroradiology staff there can do a point-to-point comparison of images from this study and images from Kentucky and see whether any changes of interest are noted." (*Id.*)

Dr. Leppman's note further reflects concerns expressed by Mr. Barber's wife about the addiction potential of methadone, and about treating Mr. Barber's headaches. Dr. Leppman reportedly responded that medical personnel would be "vigilant about

3

addictive substances." (*Id.*)  As to pain management, Mrs. Barber wanted her husband to receive Topomax because the medication had been effective for her.  Dr. Leppman reported that he "made no promises," and noted that Mr. Barber's regimen already included "gabapentin, Baclofen, and ibuprofen along with methadone." (*Id.*)

Both the Verified Complaint and the medical notes discuss Mr. Barber's problems with urination and his need for self-catheterization.  At SSCF, he allegedly had difficulty obtaining clean catheters on a daily basis.  (Doc. 5 at 6.)  The Verified Complaint does not specify any harm resulting from this alleged difficulty.  However, while Mr. Barber was incarcerated briefly at Chittenden Regional Correctional Facility ("CRCF"), Dr. Leppman reportedly misinformed the nursing staff about how often Mr. Barber would require catheterization.  Mr. Barber claims that during a three-day period at CRCF, he was only allowed to use a catheter twice a day.  As a result, he allegedly "suffered in agonizing pain for the 3 days he was there because Dr. [Leppman] did not care enough to put any thought into his patient's condition . . . ."  (Doc. 5 at 6.)

In the medical notes, Dr. Leppman confirms that he "incorrectly" advised staff at CRCF that Mr. Barber might only need a catheter twice per day.  He also reports that he "heard nothing more about this until [Mr. Barber] returned on 7/31 [2010] with a urinary tract infection which plausibly was brought on by inadequate frequency of catheterization."  (Doc. 20-4 at 1.)  The Verified Complaint states that when Mr. Barber returned to SSCF, Dr. Leppman apologized for the catheter incident.  (Doc. 5 at 6.)  The medical notes indicate that Mr. Barber was placed on "appropriate" antibiotics for his infection "while cultures [were] pending."  (Doc. 20-4 at 1.)

4

Mr. Barber filed his Verified Complaint on October 20, 2010, seeking compensatory and punitive damages. Attorney Enzor entered his appearance on Mr. Barber's behalf on March 15, 2011. Commissioner Pallito, through counsel, moved for summary judgment on June 23, 2011. Discovery closed on August 21, 2011, and the motion deadline was November 1, 2011. As noted above, the motion for summary judgment is unopposed. There has been no activity on the case docket since Commissioner Pallito submitted his motion.

## Discussion

**I.     Summary Judgment Standard**

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  When, as here, a nonmoving party fails to respond to the motion, this court nevertheless "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (internal quotations omitted).  "If the evidence submitted in support of the summary judgment

motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (internal quotations omitted).

## II. Sovereign Immunity

Defendant contends that, to the extent he is being sued in his official capacity, Mr. Barber's claim for damages is barred by the doctrine of sovereign immunity. (Doc. 20 at 10.) The Eleventh Amendment prohibits suits for damages brought in federal court against unconsenting states or state officials sued in their official capacities. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974). A state may waive its Eleventh Amendment immunity so long as the waiver is unequivocally expressed. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985). Additionally, Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Relevant to this case, Congress has not abrogated Vermont's sovereign immunity from a § 1983 suit in federal court, and the State of Vermont has expressly preserved its sovereign immunity under the Eleventh Amendment. *See, e.g.*, 12 V.S.A. § 5601(g). Accordingly, the damages claims brought against Commissioner Pallito in his official capacity should be DISMISSED.

## III. Personal Involvement

Commissioner Pallito also argues that the Verified Complaint fails to allege his personal involvement in the claimed unconstitutional conduct. (Doc. 20 at 11.) "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"

6

*Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In his Verified Complaint, Mr. Barber does not allege any active involvement in the claimed constitutional deprivations by Commissioner Pallito.   Rather, he alleges that Pallito, as the Commissioner of Corrections, "is responsible for conditions and operations including maintaining adequate medical and mental health care of the inmates."  (Doc. 5 at 2.)  He further claims that Pallito "was/is responsible for promulgating and maintaining department regulations regarding the rights and privileges of prisoners . . . and responsible for implementation of all applicable laws and regulations."  (*Id*. at 2)  Later in the Verified Complaint, Mr. Barber avers that he "is under the control" of the Commissioner.  (*Id.* at 3.)  No other mention is made of the conduct or role of the Commissioner.

"[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*."  *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citing *Al- Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)).  Furthermore, mere "linkage in the prison chain of command" is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.  *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985); *see also Wright*, 21 F.3d at 501(noting that a defendant in a § 1983 action may not be held liable for constitutional violations merely because he held a high position of authority).

Nonetheless, under certain limited circumstances, a supervisor may be held liable for unconstitutional conduct.  The Second Circuit has held that

7

> [s]upervisor liability under § 1983 "can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Hernandez*, 341 F.3d at 145; *see also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Here, insofar as Mr. Barber is alleging supervisor liability, his Verified Complaint is deficient. He does not claim that Commissioner Pallito was either directly involved in, or even aware of, his claims. Mr. Barber alleges that he filed emergency grievances about his care, but does not claim that Commissioner Pallito was involved in the grievance process, or that he was even aware of specific grievances. Nor does he allege that Commissioner Pallito helped create a policy or custom that sanctioned the allegedly-deficient medical care. There is no claim of grossly negligent supervision, and again, no suggestion that Commissioner Pallito was aware of Mr. Barber's condition such that he could now be liable for failing to take appropriate corrective action. Instead, Mr. Barber offers only general allegations of supervisory responsibility. Such claims are insufficient. *See, e.g., Wright*, 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987). I therefore recommend that the Court GRANT Commissioner Pallito's motion for

summary judgment on the basis of a failure to establish sufficient personal involvement in allegedly unconstitutional conduct.

### III. Eighth Amendment Claim

Although it is recommended that this case be dismissed on grounds of sovereign immunity and lack of personal involvement, dismissal is also warranted because Mr. Barber's Eighth Amendment claim fails on the merits. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition includes any "unnecessary and wanton infliction of pain" on those who have been convicted of crimes. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). Nevertheless, the United States Supreme Court has recognized that not "every injury" a prisoner suffers "translates into constitutional liability for prison officials." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

In order to establish a claim for unconstitutional denial of medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Hathaway*, 37 F.3d at 66 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This standard requires proof of both an objective and subjective element. First, the prisoner must demonstrate that his alleged deprivation was of a "sufficiently serious" nature. *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This can be shown by proving "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990). Courts have also considered factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical

9

condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)).

The second element requires a showing of deliberate indifference to the inmate's medical needs. *Caiozzo v. Koreman*, 581 F.3d 63, 66 (2d Cir.2009); see also *Farmer*, 511 U.S. at 835 (setting a standard of deliberate indifference in the prison context).  To demonstrate deliberate indifference, a plaintiff must prove that a defendant "disregarded a risk of harm [to a prisoner] of which the defendant was aware." *Caiozzo*, 581 F.3d at 71. As the Supreme Court instructs, a finding of deliberate indifference requires that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  It is not enough to show that an officer should have been aware that a prisoner was in immediate danger.  Rather, the evidence must allow a reasonable juror to conclude that the officer "was actually-aware of that immediate danger." *Caiozzo*, 581 F.3d at 72.  The Second Circuit has equated this state of mind with "criminal recklessness." *Hernandez*, 341 F.3d at 144.

Applying these standards here, it is clear that Mr. Barber has failed to establish an Eighth Amendment violation.   With respect to the treatment of his TM, there is no evidence of either a deprivation of medical care or of deliberate indifference.  The medical notes indicate that Mr. Barber was diagnosed with TM in the fall of 2009, whereupon he was treated at the University of Kentucky Medical Center.  Prior to this time, he submitted complaints of pain and tingling sensations, but the record before the

10

court does not indicate that such complaints would have alerted prison officials to a substantial risk of serious harm.  *Farmer*, 511 U.S. at 837.

Upon his return to Vermont, Mr. Barber was seen by a neurologist from Dartmouth Hitchcock Medical Center who ordered that he undergo a neurological study. That study was later accomplished at Fletcher Allen Health Care in Burlington, Vermont. In the most recent medical note submitted to the court, Mr. Barber's treating physician, Dr. Leppman, wrote that he would "be sure that Dr. Stommel, the neurologist at Dartmouth, has access to this report and to images" for the purpose of analysis.  (Doc. 20-4 at 1.)

Mr. Barber also claims that, while under Dr. Leppman's care, he was not provided a sufficient number of clean catheters during a three-day period at CRCF, and that he suffered a bladder infection as a result.  His allegation is that the infection was caused by the Dr. Leppman's failure to provide clear instructions to the nursing staff with regard to the number of catheters he required on a daily basis.  At most, this claim amounts to an allegation of medical negligence.

The Second Circuit has recognized that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness. . . .  In this connection, the Supreme Court has held that 'a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'"  *Id*. at 123 (quoting *Estelle*, 429 U.S. at 106).  Here, the facts at summary

11

judgment establish that Dr. Leppman was unaware of the catheter issue until Mr. Barber returned from CRCF with a urinary tract infection. (Doc. 20-4 at 1.) When the infection was revealed, Mr. Barber was placed on an "appropriate antibiotic." (*Id.*) Accordingly, the undisputed evidence before the court is that Dr. Leppman provided prompt treatment, and was not deliberately indifferent to Mr. Barber's medical needs. *Caiozzo*, 581 F.3d at 72. I therefore recommend that Defendants' motion for summary judgment be GRANTED with respect to Mr. Barber's Eighth Amendment claim.

## IV. Medical Malpractice

Defendant also contends that if the court construes Mr. Barber's claim as one of negligence, the claim cannot survive summary judgment because of Mr. Barber's failure to offer expert evidence of negligence.

Under Vermont law, a plaintiff bringing a claim of medical malpractice must prove: (1) the proper standard of medical skill and care; (2) that the defendant either lacked the requisite knowledge or skill or failed to exercise this degree of care; and (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not have otherwise been incurred. 12 V.S.A. § 1908; *Lockwood v. Lord*, 163 Vt. 210, 213, 657 A.2d 555 (1994). "These elements must generally be proved by expert testimony." *Lockwood*, 163 Vt. at 213, 657 A.2d 555 (citing *Begin v. Richmond*, 150 Vt. 517, 520, 555 A.2d 363 (1988)); see also *Jones v. Block*, 171 Vt. 569, 569, 762 A.2d 846 (2000). "Except where the alleged violation of the standard of care is so apparent that it can be understood by a layperson without the aid of medical experts, the burden of proof imposed by [Vermont's medical

malpractice statute] requires expert testimony." *Provost v. Fletcher Allen Health Care, Inc.,* 179 Vt. 545, 547, 890 A.2d 97 (2005).

In this case, the first allegation is that the DOC, and specifically Commissioner Pallito, failed to respond adequately to Mr. Barber's TM. Although Mr. Barber contends that his initial symptoms were ignored, it is clear that he was ultimately tested and diagnosed. Whether that testing and diagnosis was delayed or inadequate would require expert testimony, and none had been presented. Furthermore, the catheter question involved an alleged miscalculation by Dr. Leppman as to how often Mr. Barber would require catheterization. Whether that miscalculation constituted medical negligence is, again, beyond the realm of common layperson knowledge.

Finally, it is not clear that Mr. Barber has alleged a negligence claim. Although he initially appeared *pro se*, he is now represented by counsel, and counsel has not moved to amend the Verified Complaint to clarify the claim. Accordingly, I recommend that the court decline to consider any claim of medical malpractice, and to the extent that such a claim is considered, that it be DISMISSED.

## Conclusion

Based on the foregoing I recommend that Defendant's motion for summary judgment (Doc. 20) be GRANTED and this case be DISMISSED.

Dated at Burlington, in the District of Vermont, this 29th day of December, 2011.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See Fed. R. Civ. P. 72(a); Small v. Sec'y of Health and Human Servs*., 892 F.2d 15, 16 (2d Cir. 1989).